[Cite as *Craycraft v. Simmons*, 2011-Ohio-3273.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| AARON CRAYCRAFT, et al. | : | |
| | : | Appellate Case No. 24313 |
| Plaintiff-Appellants | : | |
| | : | Trial Court Case No. 08-CV-4049 |
| v. | : | |
| | : | |
| JOHN C. SIMMONS, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellees | : | |
| | : | |

· · · · · · · · · ·

O P I N I O N

Rendered on the 30th day of June, 2011.

· · · · · · · · ·

JEREMY M. TOMB, Atty. Reg. #0079664, and CHERYL COLLINS, Atty. Reg. #0085671, 124 West Main Street, Troy, Ohio 45373
     Attorneys for Plaintiff-Appellants

STEPHEN V. FREEZE, Atty. Reg. #0012173, Freund, Freeze & Arnold, One Dayton Centre, 1 South Main Street, Dayton, Ohio 45402
     Attorney for Defendant-Appellees

MICHAEL DeWINE, by MICHAEL J. SCHULER, Atty. Reg. #0082390, OHIO ATTORNEY GENERAL'S OFFICE, Constitutional Offices Section, 30 East Broad Street, 16th floor, Columbus, Ohio 43215
     Attorney for Defendant-Appellee, State of Ohio

· · · · · · · · ·

HALL, J.

{¶ 1}     Aaron Craycraft appeals from the trial court's entry of summary judgment against him on his tort complaint against appellees John Simmons, Marilyn Jones, and the

Miami Valley Career Technology Center.

{¶ 2}    Craycraft advances three assignments of error on appeal. First, he contends the trial court erred in entering summary judgment on the basis that his claims were barred by R.C. Chapter 2744. Second, he claims the trial court erred in finding R.C. Chapter 2744 constitutional. Third, he asserts that the trial court erred in entering summary judgment against him on his various tort claims against the appellees.

{¶ 3}    This is Craycraft's second appeal stemming from an incident that occurred on November 1, 2006, at the Miami Valley Career Technology Center (CTC), a two-year public joint vocational school. On that date, Craycraft became angry in class and destroyed a computer. While investigating the incident, Simmons, the safety coordinator at CTC, and Jones, one of his assistants, obtained written statements from several students who expressed concern about Craycraft returning to school with a gun and shooting people. One of the students had "heard a lot that he is saving for a gun and kill us (sic)." The same student wrote that others had "said that he's saving up for a gun and that if you expel him HE WILL COME BACK!!" A second student wrote: "I think he is really capable of doing the thing he's said[.] Like he will shoot everyone." A third student stated: "A few weeks ago he told the class that if by some chance he would bring a gun to school he wouldn't shoot any of us." A fourth student gave a similar statement, noting that "Aaron said we didn't have to worry because if he ever brought a gun to school he wouldn't shoot us."

{¶ 4}    Two CTC assistant superintendents, Sam Custer and Mary Beth Freeman, directed Simmons to contact the police.  After arriving at the police station, Simmons spoke on the phone with another student, Jennifer Fitzgerald, and then gave police a handwritten

statement. In relevant part, Simmons's statement read:

**{¶ 5}** "Ms. Fitzgerald advised that she was present in the classroom when Aaron Craycraft exploded smashing his school-issued laptop computer onto the floor. She further stated to me that she had heard Aaron make a statement that he was going to bring a gun to school and shoot people. And [his teacher] Ms. Livingston was on his list.

**{¶ 6}** "Ms. Fitzgerald was requested to report in the morning and give a written statement at that time. She agreed. She further stated that she was fearful of Aaron carrying out his threats."

**{¶ 7}** Fitzgerald provided her own written statement to CTC the following day. It read:

**{¶ 8}** "I don't know Aaron persay, but I know that he's been known to flip out and recently he's been talking about guns and he is very serious about it all. He's got a bad temper I guess you could say and he's serious. He doesn't like Mrs. Livingston and he's mentioned she'd be first on the list. Things have gotten worse since him and his girlfriend broke up and more than just me has noticed it. [R]ecently he made a comment to a student who was pregnant about punching her in the stomach because no one should want to have a stupid baby. He likes to dress as a pirate and he wears big combat boots that were very expensive. Along with his jacket. So he could easily have money for a gun. Another comment he's made was a joke saying what's the difference between a Mercedes and 1000 dead babies and he said he didn't have a Mercedes in his garage. He's crazy and after yesterday, I could see him doing something crazy like bringing a gun to school. He wouldn't think twice."

**{¶ 9}** Craycraft was arrested in the evening after Simmons's police report. At that

time, he learned that he had been "accused of threatening to bring a gun to school and shoot people on a 'list.'" He was detained for more than a week and charged with criminal damaging, aggravated menacing, and inducing a panic. He ultimately pled guilty to "reduced charges." He also was expelled from school.

{¶ 10}  In an affidavit, Craycraft stated he "never threatened to bring a gun to school to shoot people." The only gun he ever discussed at school was a replica Prussian revolutionary pistol. Craycraft claimed he never told people he would shoot them and never created a list of people he would shoot.   He also denied making any statement on November 1, 2006, that he would bring a gun to school and shoot people and that Mrs. Livingston was on his list.

{¶ 11}  In April 2008, Craycraft and his parents filed the present action against Simmons, alleging claims for false imprisonment, malicious prosecution, intentional infliction of emotional distress, defamation, false-light invasion of privacy, and loss of consortium. Accompanying the complaint was an affidavit from Jennifer Fitzgerald. Therein, she denied personally hearing Craycraft say he would bring a gun to school or that he would, or wanted to, shoot anyone. Fitzgerald also denied telling Simmons these things.

{¶ 12}  In a deposition, Simmons addressed the apparent discrepancy between his police statement and what Fitzgerald stated in her affidavit. Simmons asserted that Fitzgerald told him she had been threatened with a lawsuit, badgered, and coerced by the law firm representing Craycraft into signing the affidavit. According to Simmons, Fitzgerald told him that she had signed under duress and that she was willing to "sign anything" just to get Craycraft's attorney "off her back."

{¶ 13}  In April 2009, Simmons moved for summary judgment on the claims against

him. Before responding, Craycraft filed an amended complaint, adding CTC, Marilyn Jones, and the State of Ohio as defendants. The amended complaint also added general negligence and negligence per se claims against Simmons. The trial court later sustained Simmons's summary judgment motion in October 2009, finding him entitled to statutory immunity as an employee of a political subdivision. The trial court nevertheless proceeded to address each of the claims, finding that Simmons would be entitled to summary judgment on all but the false-imprisonment claim. The trial court's summary judgment ruling contained Civ.R. 54(B) certification.

{¶ 14} On November 12, 2010, this Court affirmed the trial court's entry of summary judgment in favor of Simmons. In so doing, this Court concluded that he was entitled to summary judgment on the basis of R.C. Chapter 2744 immunity because he was a CTC employee, he was acting within the scope of his employment when he investigated the incident and made his police report, and he did not act recklessly. See *Craycraft v. Simmons*, Montgomery App. No. 23755, 2010-Ohio-5518.

{¶ 15} While the first appeal was pending, the trial court made two additional rulings, declaring R.C. Chapter 2744 constitutional and entering summary judgment in favor of Simmons, Jones, and CTC on all remaining claims in Craycraft's amended complaint.[1] This appeal followed.

{¶ 16} In his first assignment of error, Craycraft contends the trial court erred in entering summary judgment against him on the basis of R.C. Chapter 2744 immunity. He

---

[1] Although the trial court already had entered summary judgment in favor of Simmons, the ruling was only a grant of partial summary judgment because it did not address the negligence and negligence per se claims that had been added in Craycraft's amended complaint.

advances three arguments in support. First, he claims CTS was liable for the negligent performance of a propriety function. Second, he argues that Simmons and Jones lacked immunity because they were acting outside the scope of their employment. Third, he asserts that Simmons and Jones were not entitled to immunity because they acted willfully and wantonly, in bad faith, or maliciously.

{¶ 17} We review summary judgment de novo, which means that "we apply the standards used by the trial court." *Brinkman v. Doughty* (2000), 140 Ohio App.3d 494, 497. Summary judgment is appropriate when a trial court finds "that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66.

{¶ 18} We begin our analysis by addressing CTC's immunity under R.C. Chapter 2744. "The Political Subdivision Tort Liability Act, contained in that chapter, prescribes a three-tier analysis to determine whether a political subdivision is immune from liability. The beginning point of the analysis is the general rule that a political subdivision is not liable in damages for loss to property allegedly caused by an act of the subdivision or one of its employees in connection with a governmental or proprietary function. The second tier of the analysis asks whether an exception to that general rule should apply, i.e., whether one of the exceptions contained in R.C. 2744.02(B)(1)–(5) applies. And, if a political subdivision loses immunity under the second tier, the third tier of the analysis asks whether a political

subdivision can restore immunity by showing that one of the defenses contained in R.C. 2744.03 applies." *Peshek v. Springfield*, Clark App. No. 2008 CA 72, 2009-Ohio-3951, ¶20. (Citations omitted.)

**{¶ 19}** see, also, *Ezerski v. Mendenhall*, 188 Ohio App.3d 126, 2010-Ohio-1904, ¶5.

**{¶ 20}** In the present case, Craycraft does not dispute that CTC, a public school, qualifies as a political subdivision for purposes of immunity under R.C. 2744.02(A)(1). He argues, however, that CTC's general immunity was abrogated by R.C. 2744.02(B)(2), which renders a political subdivision liable "for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions." According to Craycraft, Simmons and Jones negligently provided school-security related services. He asserts that their activities were proprietary functions, thereby subjecting CTC to liability. We find this argument to be unpersuasive.

**{¶ 21}** The "provision of a system of public education" is expressly identified in R.C. 2744.01(C)(2)(c) as a governmental function. The act of providing security-related services for a public school, however, is not mentioned in the statute as being either a governmental or proprietary function. Nevertheless, we believe the trial court correctly found the acts of Simmons and Jones to be governmental in nature. Maintaining order and security in the classroom and on school grounds is an integral part of providing a system of public education. In our view, providing school security and related tasks cannot be separated from the provision of a system of public education. Therefore, Simmons and Jones were performing a governmental function under R.C. 2744.01(C)(2)(c) with regard to their involvement in the Craycraft incident. Cf. *Bucey v. Carlisle*, Hamilton App. No. C-090252, 2010-Ohio-2262, ¶16

("[T]he governmental function of 'providing a system of public education' cannot be accomplished without the activity at issue here, which we regard as simply the staffing of a public school with an administrator. This activity is so fundamental to the provision of a system of public education that it cannot be considered apart from the governmental function of 'providing a system of public education.'").

**{¶ 22}** In reaching the foregoing conclusion, we reject Craycraft's assertion that providing school security is not a governmental function because independent contractors sometimes perform the job. We do not dispute that a school may choose to contract with a private company to provide security. But this does not negate the fact that the nature of the work involved, providing security for public school students on school grounds, is a governmental function. Craycraft's argument fails to recognize that a political subdivision may use independent contractors to perform a governmental function. See, e.g., *Howell v. Canton*, Stark App. No. 2007CA00035, 2008-Ohio-5558 (involving an independent contractor hired to perform a governmental function). He cites nothing to establish that doing so transforms the activity involved from a governmental function into a proprietary function.

**{¶ 23}** We turn next to Craycraft's argument that Simmons and Jones lacked immunity because they were acting outside the scope of their employment. This Court's prior decision resolved the scope-of-employment issue with regard to Simmons, reasoning:

**{¶ 24}** "The trial court also correctly determined that Simmons did not act manifestly outside the scope of his employment when he investigated the Craycraft incident and made a report to the police. With regard to the scope of Simmons' duties, Craycraft argues that the incident 'was already under investigation by Marilyn Jones and had already been referred to

the principal by the time Simmons became involved.' Craycraft asserts that he already had been suspended from school for several days. He reasons that 'Simmons' employment duties would seem to have ended at that point, or at least required him to actually investigate the matter before taking further action.'

{¶ 25}  "Upon review, we find no genuine issue of material fact as to whether Simmons was acting within the scope of his employment. His job responsibilities included maintaining a safe campus, investigating incidents, and reporting those incidents to his supervisors and, sometimes, to the police. (Simmons depo. at 33-34, 62-64). As set forth above, Simmons was summoned back from Columbus to discuss the Craycraft incident with his two assistant superintendents, Mary Beth Freeman and Sam Custer. He reviewed the written statements that had been obtained by Marilyn Jones in his absence. He then met with Freeman and Custer to discuss the incident further and to decide what to do. As explained above, Freeman and Custer ultimately directed him to contact the Englewood police department. While at the police station, Simmons spoke with a witness, student Jennifer Fitzgerald, and then filed a written statement.

{¶ 26}  "In our view, the foregoing activities manifestly were *within* the scope of Simmons' employment as CTC's head safety coordinator. The fact that one of Simmons' subordinates, Jones, already had commenced an investigation does not take his additional investigative activities outside the scope of his employment. Nor does the fact, stressed by Craycraft, that Simmons conceivably could have conducted a more thorough investigation. The question is not whether Simmons could have done more. Rather, the question is whether the acts he did perform were within the scope of his employment. The trial court correctly

concluded that they were." *Craycraft*, supra, at ¶48-50.

{¶ 27} Craycraft cites nothing in his present appeal to alter the prior determination that Simmons's actions were within the scope of his employment as CTC's safety coordinator. Therefore, we conclude that Simmons was acting within the scope of his employment when he conducted his investigation and contacted the police.[2]

{¶ 28} We reach the same conclusion with regard to Jones. As set forth above, Jones, a CTC safety officer, served as one of Simmons's assistants. She testified that her job duties include "protecting staff and students" and "investigating incidents that occur at the school." In Simmons's absence, Jones initiated an investigation into the Craycraft incident by talking to students, obtaining statements, and conveying her findings to Simmons. We harbor no doubt that these actions were within the scope of Jones's employment as one of CTC's safety officers.

{¶ 29} On appeal, however, Craycraft takes issue with Jones's alleged decision to create a poster bearing his picture with a caption warning that he was dangerous and had threatened to shoot everyone. Craycraft contends Jones acted outside the scope of her employment by creating the poster and placing it where faculty and students could view it.

{¶ 30} In the proceedings below, Jones admitted printing a poster with Craycraft's picture on it. She denied writing on the poster or placing it in public view. She testified that she placed it only in CTC's safety office. On appeal, the only evidence Craycraft cites concerning Jones's involvement with the poster is the deposition testimony of Ernie Stone,

---

[2] In his present appeal, Craycraft disputes whether the law-of-the-case doctrine precludes him from re-litigating whether Simmons was acting in the scope of his employment. We need not resolve that issue, however, because we conclude that Simmons was acting within the scope of his employment even if the law-of-the-case doctrine does not compel such a determination.

another CTC safety officer, and Simmons. In his deposition, Stone stated that Jones asked him to post the picture "to let the evening safety officers * * * know that [Craycraft] was no longer allowed to be on campus." According to Stone, Jones gave him a print-out of the picture and told him to post it in a locker in the safety office. A copy of the poster shown to Stone during his deposition had the following handwritten message below Craycraft's picture: "All Staff: This H.S. student has threatened to come in with a gun a[nd] shoot everyone. He is not to be on property. If he should come on property & you see him call security ASAP. Englewood police department needs to be here also." Stone identified the handwriting as his own but denied being aware of the picture being posted anywhere outside of the security office. Stone testified that it was his idea to write the message accompanying the picture. He explained that he got the information he wrote from a student's statement, not from Jones. For his part, Simmons testified that he saw the picture of Craycraft posted "in the staff rooms, staff lounges."

{¶ 31} Having reviewed Stone's and Simmons's deposition, we see nothing to suggest that Jones acted outside the scope of her employment with regard to the poster of Craycraft. Even if we accept Craycraft's largely unsupported assertion that Jones was responsible for the caption and for placing the poster in locations outside the security office, these actions manifestly were within the scope of her employment as a CTC security officer. We see no genuine issue of material fact for trial.

{¶ 32} Finally, we reject Craycraft's argument that Simmons and Jones were not entitled to immunity because they acted willfully and wantonly, in bad faith, or maliciously. The trial court saw no evidence to support such a finding, and neither do we. The prior ruling

of this Court rejected a similar argument by Craycraft, noting the absence of evidence to support a finding of recklessness. The court stated:

{¶ 33}   "* * * With images of the 1999 Columbine High School shooting and similar incidents etched in the nation's memory, we agree with the trial court that Simmons, the head safety coordinator at CTC, did not act recklessly in filing his police report. As the trial court noted, when he filed the report, Simmons had reviewed several written statements from students who expressed fear about Craycraft returning to school with a gun. One of the students had 'heard a lot that he is saving for a gun and kill us.' The same student wrote that others had 'said that he's saving up for a gun and that if you expel him HE WILL COME BACK!!' A second student wrote: 'I think he is really capable of doing the thing he's said[.] Like he will shoot everyone.' A third student stated: 'A few weeks ago he told the class that if by some chance he would bring a gun to school he wouldn't shoot any of us.' A fourth student gave a similar statement, noting that 'Aaron said we didn't have to worry because if he ever brought a gun to school he wouldn't shoot us.' Although Simmons did not cite each of these statements in his police report, he was aware of them and they were part of the reason he contacted the Englewood police and filed the statement he did. (Simmons affidavit at ¶7, 9, 11, 13).

{¶ 34}   "Craycraft makes much of the fact that Simmons' police report attributes certain statements to Jennifer Fitzgerald that she later denied in her affidavit. We do recognize one significant discrepancy, namely whether Fitzgerald ever personally heard Craycraft say he was going to bring a gun to school and shoot people. In her affidavit, she denied telling Simmons that she personally heard this. We note, however, that the written statement

Fitzgerald provided for CTC the day after the incident did express her serious concern about Craycraft bringing a gun to school and shooting people. As noted above, Fitzgerald reported that Craycraft had 'been known to flip out and recently he's been talking about guns and he is very serious about it all.' She added: 'He's got a bad temper I guess you could say and he's serious. He doesn't like Mrs. Livingston and he's mentioned she'd be first on the list.' Finally, she expressed her opinion that 'he could easily have money for a gun' and that '[h]e's crazy and after yesterday, I could see him doing something crazy like bringing a gun to school.' Although this written statement does not reference the unambiguous, direct threat mentioned in Simmons' police report (which Simmons concedes was not a verbatim recitation of what Fitzgerald told him), it is consistent with much of the other students' written statements about Craycraft bringing a gun to school and shooting people. It also corroborates the part of Simmons' police report in which he mentioned Fitzgerald telling him a teacher, Peggy Livingston, was on Craycraft's 'list.'

{¶ 35}   "Even if we assume, as we must for summary judgment purposes, that Simmons inaccurately quoted Fitzgerald in his police report, based on all of the evidence before us we find no genuine issue of material fact as to whether Simmons, CTC's head security official, acted recklessly in filing the report. Accordingly, we agree with the trial court that Simmons is entitled to R.C. Chapter 2744 immunity, as a matter of law." *Craycraft*, supra, at ¶64-66.

{¶ 36}   For essentially the same reasons that this Court previously found no genuine issue of material fact on the issue of Simmons's recklessness, we now find no genuine issue of material fact as to whether he acted willfully and wantonly, in bad faith, or maliciously. We

reach the same conclusion with regard to Jones. The record reflects that she investigated the incident involving Craycraft, took statements from students, and turned her information over to Simmons. She also provided Stone with a poster showing Craycraft's picture and directed him to post it in a locker in the safety office. Even if we assume, arguendo, that Jones played a role in a warning being written below the picture and the picture being posted in staff lounges, we see no genuine issue of material fact that she did not act willfully and wantonly, in bad faith, or maliciously. The written statements obtained from CTC's students support the essence of the caption, and Jones testified that the poster was a security measure. We see no error in the trial court's ruling. The first assignment of error is overruled.

{¶ 37}   In his second assignment of error, Craycraft claims the trial court erred in upholding the constitutionality of R.C. Chapter 2744. He maintains that the statute violates his constitutional right to a jury trial and to a remedy.   We disagree. This Court previously rejected the same arguments in *Bundy v. Five Rivers Metroparks*, 152 Ohio App.3d 426, 2003-Ohio-1766; see, also, *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶95 (citing *Bundy* and describing the constitutionality of R.C. Chapter 2744 as "settled"). We see no need for further discussion here. Based on this Court's ruling in *Bundy*, Craycraft's second assignment of error is overruled.

{¶ 38}   In his third assignment of error, Craycraft asserts that the trial court erred in entering summary judgment against him on his various tort claims against the appellees. In support, he presumes that R.C. Chapter 2744 immunity does not apply and addresses the merits of each claim. Based on the existence of immunity under R.C. Chapter 2744, however, we need not address the merits of the tort claims. Because the appellees are immune under

R.C. Chapter 2744, we overrule the third assignment of error as moot.

{¶ 39}    The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . . .

FAIN, J. and FROELICH, JJ., concur.


Copies mailed to:

Jeremy M. Tomb
Cheryl L. Collins
Stephen V. Freeze
Michael DeWine
Michael J. Schuler
Hon. Timothy J. O'Connell