[Cite as *Strayer v. Barnett*, 2017-Ohio-5617.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| BRANDON M. STRAYER, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | C.A. CASE NO.   2016-CA-19 |
| | : | |
| v. | : | T.C. NO. 14CV300 |
| | : | |
| WESLEY R. BARNETT, et al. | : | (Civil Appeal from |
| | : |  Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the _____30th_____ day of _____June_____, 2017.

. . . . . . . . . . .

VALERIE JUERGENS WILT, Atty. Reg. No. 0040413, 333 N. Limestone Street, Suite 202A, Springfield, Ohio 45503
      Attorney for Plaintiffs-Appellants

MARK LANDES, Atty. Reg. No. 0027227 and ANDREW N. YOSOWITZ, Atty. Reg. No. 0075306, 2 Miranova Place, Suite 700, Columbus, Ohio 43215
      Attorneys for Defendants-Appellees

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Plaintiffs Brandon Strayer, Amber Strayer, E.S. ("E."), and A.H. (collectively, "the Strayers") appeal from a judgment of the Clark County Court of Common Pleas, which granted summary judgment to the Clark County Commissioners, Clark County Board of Developmental Disabilities ("CCDD"), and CCDD's employees Heather Garrett, Rodney Willis, and Matt Horvath (collectively, "the Clark County Defendants"). For the

following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} Wesley Barnett is a young adult who has been diagnosed with autism, is nonverbal, and has moderate mental disabilities; he has also been diagnosed with obsessive-compulsive disorder and bipolar disorder. In June 2012, Barnett was twenty years old.

{¶ 3} From June 2006 to May 25, 2012, Barnett resided at the Indiana Developmental Training Center ("IDTC") in Indiana, where he received behavioral assessments, psychological assessments, and treatment. Barnett had a behavioral support plan with goals to improve his anger management, impulse control, inappropriate toileting, and compliance with rules and instructions. Barnett was generally unable to "process the cause and effect of his decisions." (Garrett Depo. at 42.)

{¶ 4} Barnett's aggressive behaviors included biting, kicking, scratching, head butting, slapping, and hitting. Barnett's parents had reported to IDTC that Barnett would often behave aggressively when hungry, when others were in his space, or when something was not as he anticipated it to be. IDTC's August 2011 Life Skills Assessment noted that Barnett "[w]ill bite others when angry/upset." However, IDTC's February 2012 monthly progress report indicated that Barnett "displays these [aggressive] behaviors infrequently"; during the six-month period between August 2011 and January 2012, Barnett displayed physical aggression toward his peers on three occasions and was not physically aggressive toward staff. IDTC's Biannual Treatment Plan Review, dated April 13, 2012, stated that Barnett was physically aggressive with his peers twice in February 2012 and twice in March 2012.

**{¶ 5}** On February 28, 2012, IDTC notified CCDD that it would no longer be able to serve Barnett. CCDD employees investigated and discussed several placement options with Barnett's parents, who were Barnett's legal guardians. The actions of specific CCDD employees will be discussed in more detail below.

**{¶ 6}** The Barnetts selected a home in Springfield that was owned and operated by Housing Connections, an independent housing corporation that rents solely to individuals that are eligible for services with a board of developmental disabilities. Barnett moved to the home on May 25, 2012, and he received "24 hour/seven day per week" care by employees of Self Reliance, Inc. ("SRI"), a provider licensed by the Ohio Department of Development Disabilities to provide direct services to individuals with developmental disabilities. Barnett had one roommate, Dale, at the house.

**{¶ 7}** The Housing Connections home was located on the same street as the Strayer family's residence. On June 21, 2012, Barnett went for a walk with Dale, supervised by Joy Wells, an SRI employee. During the walk, the three passed the Strayers' home. Two-year-old E. was playing in his front yard with a girl. According to Wells, the girl sprayed E. in the back with a hose, causing E. to scream loudly. Barnett then ran behind Wells and over to E. Barnett bent down, bit E.'s upper arm, and pushed E. to the ground. E.'s nine-year-old sister witnessed the assault.

**{¶ 8}** In December 2012, the Strayers brought suit against Barnett, SRI, Clark County, various County and SRI employees, and others, based on the assault on E. *Strayer v. Barnett*, Clark C.P. No. 12CV1276. The Stayers voluntarily dismissed the action, without prejudice, on December 19, 2013.

**{¶ 9}** On May 13, 2014, the Strayers refiled the lawsuit (the present action), naming

as defendants Barnett, SRI, Wells, the Ohio Department of Job and Family Services ("ODJFS"), and the Clark County Defendants. The State of Ohio filed a cross-claim against the other defendants for medical payments made on behalf of E. due to the incident. The Strayers reached a settlement with the SRI Defendants and voluntarily dismissed their claims against the SRI Defendants in January 2016.

{¶ 10} The Strayers' claims against the Clark County Defendants were based on the CCDD's employees' alleged reckless failure to provide appropriate "service and support administration" to Barnett. The crux of their claims was that the Clark County Defendants failed to provide an updated individual plan (IP) and behavior support plan for Wesley to SRI, and thus SRI employees did not have the guidance documents they needed to prevent aggressive actions by Barnett.

{¶ 11} On December 23, 2015, the Clark County Defendants moved for summary judgment on the Strayers' claims, raising four arguments: (1) they owed no duty of care to the Strayers, because they had no "special relationship" with Barnett; (2) CCDD was entitled to sovereign immunity under R.C. Chapter 2744; (3) CCDD was entitled to immunity under R.C. 2305.51, which provides immunity, under certain circumstances, to mental health providers and organizations for the violent behavior of their clients; and (4) Willis, Garrett, and Horvath, as employees of CCDD, were entitled to immunity under R.C. Chapter 2744. The Strayers opposed the motion.

{¶ 12} On March 11, 2016, the trial court granted the Clark County Defendants' motion for summary judgment. The court's ruling stated, in its entirety, that it had reviewed the case file, pleadings, and memoranda of counsel, and "[a]dopting the reasoning as set out in defendants' memorandum, the Court finds the Clark County

Defendants owed no duty to the plaintiffs and they are entitled to statutory immunity under R.C. 2305.51 and R.C. Chapter 2744. Further, Plaintiff has failed to provide any evidence that Wesley Barnett's conduct proximately caused the harm to [E.S.]."[1] The trial court determined that its ruling was a final appealable order and that there was no just reason for delay, in accordance with Civ.R. 54(B).

{¶ 13} The Strayers appeal from the trial court's grant of summary judgment to the Clark County Defendants. They raise four assignments of error: (1) that the Clark County Defendants were not entitled to immunity under R.C. 2305.51; (2) that the Clark County Defendants were not entitled to immunity under R.C. Chapter 2744; (3) that the Clark County Defendants had a duty to Barnett and the community and that the harm was foreseeable; and (4) that the CCDD employees' conduct rose to the level of recklessness and they were not entitled to immunity.

{¶ 14} As discussed below, we conclude that the trial court properly granted summary judgment to the Clark County Defendants under R.C. Chapter 2744. Accordingly, we need not address the Strayers' first and third assignments of error, and those assignments of error are overruled as moot.

## II. Summary Judgment Standard

{¶ 15} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in

---

[1] We question whether the trial court meant to say "Wesley Barnett's conduct," as opposed to the Clark County Defendants' conduct. It appears undisputed that Wesley Barnett bit and pushed E. The parties dispute, however, whether the Clark County Defendants are liable for E.'s injuries.

favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264 (1996).

{¶ 16} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 17} We review the trial court's grant of a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

### III. Sovereign Immunity: Political Subdivisions

{¶ 18} CCDD serves individuals with developmental disabilities in Clark County. At CCDD, the service and support administrators are called Path Coordinators. Their duties include: (1) assessment of the individual's need for services; (2) build a team to

support the individual, facilitate the development of and write an "Individual Plan," and authorize services; (3) coordinate services; (4) monitor implementation of the IP by providers, modify the plan as needed; (5) ensure actions are completed as necessary to maintain eligibility for all Ohio Department of Developmental Disabilities-administered waiver programs; and (6) provide crisis intervention. (Willis Ex. 21, Description of Services: Path Coordination)

{¶ 19} In general, political subdivisions are immune from liability for personal injuries caused by any act of the political subdivision or its employees. R.C. 2744.02(A)(1). It is undisputed that CCDD is a political subdivision, as defined by R.C. 2744.01(F).

{¶ 20} R.C. 2744.02(B) sets forth five exceptions to this general rule. The first four exceptions impose liability on a political subdivision for certain negligent conduct of the political subdivision itself or of one of its employees, namely: (1) the negligent operation of any motor vehicle while within the scope of employment, (2) acts with respect to proprietary functions of the political subdivisions, (3) failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, and (4) negligent acts that occur within or on the grounds of, and are due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function. The fifth exception imposes liability when another section of the Revised Code expressly imposes liability. R.C. 2744.02(B)(1)-(5). *See, e.g., Crafton v. Shriner Building Co., L.L.C.*, 2d Dist. Montgomery No. 25748, 2013-Ohio-4236, ¶ 10. If one of the exceptions to immunity applies, the political subdivision may still be immune if one of the defenses in R.C. 2744.03 applies. *Riffle v. Physicians & Surgeons*

*Ambulance Serv., Inc.*, 135 Ohio St.3d 357, 2013-Ohio-989, 986 N.E.2d 983, ¶ 15.

{¶ 21} The Strayers claim that CCDD is not immune pursuant to R.C. 2744.02(B)(2), which states that political subdivisions are generally "liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions."

{¶ 22} Pursuant to R.C. 2744.01(C)(1), a governmental function is one specified in R.C. 2744.01(C)(2) or a function that either: (a) is imposed on the state as an obligation of sovereignty and is performed by a political subdivision voluntarily or pursuant to legislative requirement; (b) is for the common good of all citizens of the state; or (c) promotes or preserves the public peace, health, safety, or welfare, and involves activities not customarily engaged in by nongovernmental persons, and is not specified in R.C. 2744.01(G)(2) as a proprietary function.

{¶ 23} R.C. 2744.01(C)(2) provides a nonexhaustive list of 24 functions that qualify as governmental functions. These include, for example, "[t]he operation of mental health facilities, developmental disabilities facilities, alcohol treatment and control centers, and children's homes or agencies," R.C. 2744.01(C)(2)(o); and "[a] function that the general assembly mandates a political subdivision to perform," R.C. 2744.01(C)(2)(x).

{¶ 24} A "proprietary function" is defined as function of a political subdivision that is specified in R.C. 2744.01(G)(2) or that satisfies both of the following:

(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

(b) The function is one that promotes or preserves the public peace, health,

safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.

{¶ 25} The Strayers claim that CCDD performed a proprietary function with respect to Barnett for four reasons. First, they assert that this action did not arise out of the operation of a developmental disabilities facility or out of an obligation that CCDD was required by law to perform. The Strayers argue that CCDD did not own the house where Barnett resided when the assault occurred, and it was not obligated by law to provide service and support administration to Barnett. Second, they claim that the provision of service and support administration "is not an obligation of Clark County's sovereignty." Third, they claim that "the function of the CCDD is not for the common good for all citizens of the state," because it is "for only those developmentally disabled individuals who qualify." Fourth, they assert that the type of service and support administration that CCDD provided to Barnett "is customarily engaged by non-governmental persons in a number of ways." The primary thrust of their argument is that non-governmental entities can and do provide service and support administration, which renders that activity a proprietary function, not a governmental function.

{¶ 26} Pursuant to R.C. 5126.02(A), each county must have its own county board of developmental disabilities. The Revised Code requires county boards of developmental disabilities to "plan and set priorities" for the provision of "facilities, programs, and other services to meet the needs of county residents who are individuals with * * * developmental disabilities * * *." R.C. 5126.04(A). Each county must "assess the facility and service needs of the individuals with * * * developmental disabilities," require "individual habilitation or service plans for individuals with * * * developmental

disabilities who are being served or who have been determined eligible for services and are awaiting the provision of services," and ensure that "methods of having their service needs evaluated are available."[2]   *Id.*

{¶ 27} R.C. 5126.05 sets forth the responsibilities of a county board of developmental disabilities.   Those responsibilities include:

(1) Administer and operate facilities, programs, and services as provided by this chapter and Chapter 3323. of the Revised Code and establish policies for their administration and operation;

(2) Coordinate, monitor, and evaluate existing services and facilities available to individuals with * * * developmental disabilities;

(3) Provide early childhood services, supportive home services, and adult services, according to the plan and priorities developed under section 5126.04 of the Revised Code;

(4) Provide or contract for special education services pursuant to Chapters 3306., 3317. and 3323. of the Revised Code and ensure that related services, as defined in section 3323.01 of the Revised Code, are available according to the plan and priorities developed under section 5126.04 of the Revised Code;

(5) Adopt a budget, authorize expenditures * * *, approve attendance of board members and employees at professional meetings and approve

---

[2] At the time of the assault on E., R.C. Chapter 5126 addressed the needs of individuals with "mental retardation and other developmental disabilities."   The current version of the statute has eliminated the reference to "mental retardation" and refers to "individuals with developmental disabilities."

expenditures for attendance, and exercise such powers and duties as are prescribed by the director;

(6) Submit annual reports of its work and expenditures * * *;

(7) Authorize all positions of employment, establish compensation, including but not limited to salary schedules and fringe benefits for all board employees, approve contracts of employment for management employees that are for a term of more than one year, employ legal counsel under section 309.10 of the Revised Code, and contract for employee benefits;

(8) *Provide service and support administration in accordance with section 5126.15 of the Revised Code*;

(9) Certify respite care homes pursuant to rules adopted under section 5123.171 of the Revised Code by the director of developmental disabilities.

(Emphasis added.)[3]

{¶ 28} Service and support administration is addressed in R.C. 5126.15. Under R.C. 5126.15(A), county boards of developmental disabilities are required to provide service and support administration to each individual three years of age or older who is eligible for service and support administration if the individual requests, or a person on the individual's behalf requests, service and support administration. "A board shall provide service and support administration to each individual receiving home and community-based services." *Id.* The county board of developmental disability may provide service and support administration "by directly employing service and support administrators or by contracting with entities for the performance of service and support

---

[3] Two additional duties were added in Am.Sub.H.B. 59, effective September 29, 2013.

administration." *Id.*

{¶ 29} R.C. 5126.15(B) identifies certain duties for individuals who are either employed by or under contact with a board to provide service and support administration. These duties include:

(1) Establish an individual's eligibility for the services of the county board of developmental disabilities;

(2) Assess individual needs for services;

(3) Develop individual service plans with the active participation of the individual to be served, other persons selected by the individual, and, when applicable, the provider selected by the individual, and recommend the plans for approval by the department of developmental disabilities when services included in the plans are funded through medicaid;

(4) Establish budgets for services based on the individual's assessed needs and preferred ways of meeting those needs;

(5) Assist individuals in making selections from among the providers they have chosen;

(6) Ensure that services are effectively coordinated and provided by appropriate providers;

(7) Establish and implement an ongoing system of monitoring the implementation of individual service plans to achieve consistent implementation and the desired outcomes for the individual;

(8) Perform quality assurance reviews as a distinct function of service and support administration;

(9) Incorporate the results of quality assurance reviews and identified trends and patterns of unusual incidents and major unusual incidents into amendments of an individual's service plan for the purpose of improving and enhancing the quality and appropriateness of services rendered to the individual;

(10) Ensure that each individual receiving services has a designated person who is responsible on a continuing basis for providing the individual with representation, advocacy, advice, and assistance related to the day-to-day coordination of services in accordance with the individual's service plan.

* * *

{¶ 30} In arguing that CCDD was not obligated by law to provide service and support administration, the Strayers emphasize the portion of R.C. 5126.15(A) that states, "A board may provide service and support administration by directly employing service and support administrators *or by contracting with entities for the performance of service and support administration*." (Emphasis added.) They argue that a function that can be contracted out to a private entity "is the antithesis of a governmental function."

{¶ 31} We do not accept the Strayers' assertion that the provision of service and support administration is not a governmental function merely because non-governmental entities also may engage in this activity. A political subdivision may use independent contractors to perform a governmental function without transforming the activity involved into a proprietary function. *See Craycraft v. Simmons*, 2d Dist. Montgomery No. 24313, 2011-Ohio-3273, ¶ 22. In *Craycraft*, the plaintiff asserted that the provision of school security was a proprietary function, because independent contractors sometimes perform

the job.   We rejected the assertion, stating:

> We do not dispute that a school may choose to contract with a private company to provide security.   But this does not negate the fact that the nature of the work involved, providing security for public school students on school grounds, is a governmental function.   Craycraft's argument fails to recognize that a political subdivision may use independent contractors to perform a governmental function.   *See, e.g., Howell v. Canton*, Stark App. No. 2007CA00035, 2008-Ohio-5558 (involving an independent contractor hired to perform a governmental function).   He cites nothing to establish that doing so transforms the activity involved from a governmental function into a proprietary function.

*Craycraft* at ¶ 22.

{¶ 32} R.C. 5126.05 unambiguously requires the county board of developmental disabilities to provide service and support administration.   By its plain language, R.C. 5126.15(A) permits a county board to decide whether to provide service and support administration itself with county employees or to contract with an outside entity to provide those services.   But, the ability of a county board to contract with an outside entity does not diminish the board's statutory obligation to ensure that service and support administration is provided.   And, in this case, CCDD elected to provide service and support administration itself, pursuant to R.C. 5126.15.

{¶ 33} We reject the Strayers' contention that CCDD's provision of service and support administration is a proprietary function simply because CCDD services individuals with developmental disabilities, rather than the county population at large.

{¶ 34} In summary, R.C. Chapter 5126 requires each county to have a board of developmental disabilities, and the duties of a county board of developmental disabilities include the provision of service and support administration, in accordance with R.C. 5126.15. Because the provision of service and support administration is a "function that the general assembly mandates a political subdivision to perform," R.C. 2744.01(C)(2)(x), the provision of service and support administration is a governmental function; none of the exceptions to sovereign immunity in R.C. 2744.02(B) applies.

{¶ 35} CCDD and the Clark County Board of Commissioners were performing a governmental function, and the trial court properly granted them summary judgment on that ground that they were entitled to immunity under R.C. Chapter 2744.

### IV. Sovereign Immunity: Employees of CCDD

{¶ 36} The Strayers claims that three CCDD employees – Horvath, Garrett, and Willis – were reckless in their provision of service and support administration to Barnett, and consequently, they are not immune under R.C. 2744.03(A)(6). Garrett and Horvath were Path Coordinators for Barnett; Willis was the Path Coordinator supervisor.

*A. Standard for Immunity under R.C. 2744.03(A)(6)*

{¶ 37} R.C. 2744.03(A)(6) grants employees of political subdivisions immunity from liability, unless any of three exceptions to that immunity apply. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 21. Those exceptions are (1) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (2) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

and (3) civil liability is expressly imposed upon the employee by a section of the Revised Code. R.C. 2744.03(A)(6)(a)-(c). Only the second exception is at issue here, and we confine our discussion to whether CCDD's employees were wanton or reckless; there is no allegation, or any facts to support, that the CCDD employees' actions were manifestly outside the scope of their employment or official responsibilities or that they acted with a malicious purpose or in bad faith.

{¶ 38} The terms "wanton" and "reckless" describe different and distinct degrees of care and are not interchangeable. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph one of the syllabus. They are sometimes described "as being on a continuum, i.e., willful conduct is more culpable than wanton, and wanton conduct is more culpable than reckless." *Id.* at ¶ 42 (Lanzinger, J., concurring in judgment in part and dissenting in part).

{¶ 39} Both "wanton" and "reckless" represent "rigorous standards that will in most circumstances be difficult to establish." *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E. 3d 161, ¶ 8. "Wanton conduct" has been defined as "the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." (Emphasis added.) *Anderson* at paragraph three of the syllabus; *Argabrite* at ¶ 8. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34, adopting 2 Restatement of the Law 2d, Torts, Section 500 (1965); *Argabrite* at ¶ 8.

{¶ 40} Mere negligence in the performance of an employee's duties is insufficient

to meet this high standard. *See O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 74. As stated by the Ohio Supreme Court, an individual's conduct " 'is in reckless disregard of the safety of others if * * * such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994), quoting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965).

*B. Evidence Related to CCDD Employee Conduct*

{¶ 41} According to the record, the last Individual Plan (IP) in effect for Barnett prior to the June 21, 2012 incident was effective March 18, 2012. Barnett had a behavioral support plan with IDTC, which was updated periodically; Barnett's most recent behavioral support plan prior to the assault was dated February 2012 and prepared by IDTC. That support plan was cancelled when Barnett returned to Ohio.

{¶ 42} According to Garrett's affidavit and deposition testimony, Garrett was a Path Coordinator with CCDD between September 2003 and March 29, 2012. She was the Path Coordinator for Barnett for many years.

{¶ 43} Garrett completed an individual assessment for Barnett on February 9, 2012, while Barnett was still at IDTC. (Willis Ex. 13) After CCDD was notified that IDTC would stop providing services for Barnett as of May 25, 2012, Garrett began working with Barnett's parents and researched options on home living arrangements and the providers that could provide services for Barnett. (Willis Depo. at 86.) Barnett's parents, as Barnett's guardians, were responsible for selecting the service provider and housing location for Barnett.

{¶ 44} Garrett stated that she immediately contacted Barnett's parents to inform

them of IDTC's decision and to "begin figuring out" what they would like to do regarding Barnett's placement and schooling. (Garrett Aff. at ¶ 9.) Barnett's mother told Garrett that she would like CCDD to investigate Consumer Support Services, Barnett's former provider, as a placement option; Garrett spoke with April Grigsby of CSS, but there were no openings at CSS's facility in Clark County. (*Id.* at ¶ 10-11.) Garrett discussed other possible housing options with Grigsby. (*Id.* at ¶ 12.)

{¶ 45} On March 1, 2012, Garrett received a monthly status report from IDTC, which reported that Barnett had no aggressive incidents in January and that he had made progress on his home goals. On March 5, she emailed other Path Coordinators, including Horvath, to see if Barnett would be a suitable roommate with any of their clients. On March 7, Garrett received a response from Horvath stating that Barnett might be a good match with Dale and that he (Horvath) would look into it further. Wendy Mahar of SRI also indicated that she thought that Barnett and Dale would be a good match. Garrett met with Barnett's mother on March 8 to discuss options for Barnett, and on March 9, Garrett worked on coordinating roommate visits for Barnett.

{¶ 46} Garrett also investigated schooling options for Barnett. She contacted Springfield City Schools, Summit Academy, Goodwill Easter Seals in Beavercreek, and Bittersweet Farms.

{¶ 47} On several days, Garrett and Barnett's mother toured potential housing opportunities and school options. On March 16, they toured a home on Delcourt and discussed visiting Dale's residence. On March 19, Garrett, Barnett, and Barnett's mother toured Quest, CCDD's adult day habilitation program, and met with Dale, Horvath, and two of Dale's staff from Dale's residence. On March 22, Garrett and Barnett's mother

took a tour of Goodwill Easter Seals in Beavercreek; they discussed the advantages and disadvantages of Goodwill versus Quest.

{¶ 48} On March 22, Barnett's mother chose to have Barnett live with Dale in a Housing Connections house, and Garrett e-mailed Mahar at SRI to inform her that Barnett's mother wanted Barnett to live with Dale. Garrett also spoke with Horvath, Dale's Path Coordinator, about his (Horvath's) also being Barnett's Path Coordinator since she (Garrett) would soon be leaving for a new job. Horvath agreed.

{¶ 49} Garrett began to coordinate a time to discuss Barnett's Individual Plan (IP), and a meeting was tentatively scheduled for April 3, 2012. On March 26, the IP meeting was rescheduled for April 4, 2012. Garrett e-mailed Mahar of SRI a copy of Barnett's "most recent IP and Behavioral Support Plan. I explained in the email that there may be several changes as Wesley [Barnett] was coming out of a facility." Mahar initially did not receive Garrett's email with Barnett's plans, so Garrett resent it. Elizabeth Crawford, CEO of SRI, confirmed that SRI had received Barnett's IP and behavior support plan from IDTC, IDTC's documentation that supported the behavior support plan, and a psychological evaluation of Barnett.

{¶ 50} Garrett's last day of employment with CCDD was March 29, 2012, and she had no further involvement with Barnett's case. Horvath became Barnett's Path Coordinator after March 30, 2012, following Garrett's departure from CCDD.

{¶ 51} Horvath testified at his deposition that, once he became Barnett's Path Coordinator, he read the information in Barnett's file and began working on Barnett's relocation. Horvath stated that Garrett had set up day programming in Beavercreek, so he (Horvath) visited the program with Sam Menier, the positive support specialist for

CCDD, and tried to arrange for transportation for Barnett. (Willis testified that Menier sits on teams and helps teams determine interventions; Menier also writes the formalized behavior support plans for CCDD. (Willis Depo. at 110.)) When Horvath could not solve the transportation problem, he began working on getting Barnett into Quest.

{¶ 52} Horvath also testified that he worked on arrangements with SRI, and he included Menier in the planning for Barnett's care. Horvath testified that Menier wrote a behavior support plan for Barnett. Horvath indicated that he completed everything he needed to do for Barnett's transition, including Barnett's bank account, medications, transportation, and training with the "residential folks and workshop folks." He stated that the only thing that remained to do was "the final paperwork," meaning the IP. (Horvath Depo. at 27.) Horvath stated that he had sent Mahar everything that he had received from IDTC, including the IP and behavior support plan. Menier drafted positive behavior supports for Barnett; however, a behavior support plan was not finalized. (*Id.* at 55-56, 68.) (SRI received the positive support plan that Menier drafted, but it is unclear whether it was received before or after the June 21 incident.) Horvath stated that Menier conducted training with SRI on Barnett's treatments and behavior.

{¶ 53} Horvath, Willis, Mahar, and Barnett's parents each testified in their depositions that there were numerous meetings regarding Wesley. Willis, the Path Coordinator supervisor, stated in his deposition that, once Barnett's parents selected a residence and service provider for Barnett, the support team had numerous meetings to prepare for Barnett's relocation. The team consisted of Barnett's Path Coordinator, Barnett's parents, representatives of SRI, and Menier. When Barnett began adult day services at Quest, a representative of Quest joined the team. Horvath likewise stated

that there were "a ton of conversations and meetings about Wesley [Barnett] and Dale and setting up providers. * * * It was a huge undertaking."  (Horvath Depo. at 31.)

**{¶ 54}** Wendy Mahar, associate director of SRI, testified in her deposition that there were "lots of meetings" during which they talked about Barnett (his likes, dislikes, etc.), and discussed what the Barnetts thought, what their (the parents') wishes were, and what they wanted from SRI regarding services.  When asked how many meetings were held before Barnett became a client, Mahar responded, "I couldn't even guess.  There were so many."  Mahar testified that she received from CCDD everything that CCDD had received from IDTC.  Mahar stated that she did not feel that there was paperwork that she needed, but was not getting, regarding Barnett.

**{¶ 55}** Garrett testified that the IP was required to be maintained at the residence of a CCDD client, as well as the behavior support plan, if the client had one.  SRI would also have certain documentation, created by SRI, that it would need to keep at the residence, such as time sheets, log notes, and the like.  (Garrett Depo. at 43-44.)  Wells (the SRI employee who was with Barnett during the June 21 incident) testified that an IP for Barnett was at the house and that she had received additional information about Barnett from his mother; Wells used the IP to take care of Barnett.  SRI's answers to interrogatories also indicated that "[t]he staff had received training based on Wesley's Individual Plan from his previous case provider while awaiting an updated Individual Plan from the Clark County Board of DD.  The Individual Plan gave staff procedures to follow for all home, medical and community needs."  SRI employees completed a "Daily Documentation" form, which contained similar guidelines as Barnett's March 2012 IP.

**{¶ 56}** Wells stated that she did not have a written behavior support plan for

Barnett. Crawford (CEO of SRI) stated in her deposition that Barnett did not have a behavior support plan from the beginning, "[b]ecause in our initial meetings and discussions, we felt that we should give him an opportunity to adjust to his new environment and his new home before placing possible unnecessary restrictions on him. Clark County is a leader in the state of Ohio in regards to behavior support. And we are very forward-thinking, as far as using the lowest level of restrictions possible for individuals." (Crawford Depo. at 40.) Crawford stated that SRI staff had Barnett's prior behavior support plan from IDTC "for informational purposes only for his history, not as a guideline for [SRI] staff"; the plan was used "as a training tool just so the staff would be aware of Wesley's previous behaviors." (*Id.* at 57.)

{¶ 57} Crawford testified that SRI staff receive "Do The Right Thing" training within their first three to six months of employment. Crawford explained that Do The Right Thing training includes "teaching staff how to protect themselves if there are physical behaviors, how to protect others, how to protect the individual. It does teach some restraints, but [SRI] staff are not allowed to use any restraints unless it is specifically written in a behavior support plan." (Crawford Depo. at 46.) Wells testified that she had received Do the Right Thing training.

{¶ 58} Willis and Crawford also testified about the plan that was in place for Barnett's transition back into the community upon his return to Ohio. Willis testified that the "team planned very well in advance" between the time that CCDD was notified of Barnett's anticipated discharge from IDTC through June 21, 2012, but he indicated that there was a "paperwork issue." He stated: "I mean, the new provider has copies of the current plan that was in place; it was just not updated with a change of provider. You

know, the whole team was on board. It was just an accident. We couldn't have prevented it." (Willis Depo. at 88-89.) Willis later reiterated, "The county board had a thorough up-to-date and current individual plan in place. As I had stated earlier, the only error that we had in that was that we didn't change it to Self-Reliance as the provider, but nothing would have changed in the plan." (*Id.* at 102.) Willis indicated that Sam Menier met with Barnett's service providers and trained them on behaviors of concern.

{¶ 59} Crawford testified:

In our meetings and in our discussions, in our e-mails, in our phone calls and everything, in review of his other documents from the institution and all of that pre-stuff before he came to be with us, we all knew – when I say we, I mean, the County board path coordinator, myself, Wendy, our staff supervisor, we all were very clear on what the plan was, how that transition was going to work, what we needed to do in the home to help him transition smoothly. We all communicated that very effectively among each other and then we communicated that to our staff in the home.

(Crawford Depo. at 67.)

{¶ 60} Between May 25 (when Barnett moved into the home) and June 21 (the assault on E.), SRI filed ten "unusual incident" (UI) reports with CCDD, which were faxed to Horvath. Twice on May 30, a SRI staff member reported that Barnett was engaged in masturbation behaviors in the living room, which required redirection. On four different dates in June, Barnett tried to use milk from his roommate's refrigerator. At three different times on June 16, Barnett broke window treatments inside the house. On June 15, SRI staff noticed a red mark on Barnett's forehead. Willis testified that when CCDD

receives UIs "and it's a pattern, then we have to – the team has to meet and they have to discuss what the prevention plan is as the full team." In contrast, with a major usual incident (MUI), "you have to immediately put in prevention plans to assure health and safety." (The assault on E. was considered a MUI.) On June 19, Quest staff reported that Barnett had bitten another consumer of their services.

{¶ 61} The Stayers offered the deposition testimony of Dr. Terrance Kukor, Ph.D., a clinical psychologist with a certification in forensic psychology by the American Board of Professional Psychology. Dr. Kukor opined that CCDD and its employees were reckless, because they did not prepare a written IP and behavior support plan specific to Barnett's residential circumstances. (Kukor Depo. at 65-67.) Dr. Kukor stated that, without a written plan, "you don't have a map * * * that you can share across shifts, that you share across staff and say here's the plan for Wesley." (*Id.* at 71.) Dr. Kukor further explained:

> [I]t's the plan that would tell me did they [CCDD] adequately account for what was known about his [Barnett's] tendency to be violent. It's one thing to say, sure we discussed it. There's no documentation. I can't tell what – how far that discussion went, if they were properly applying the information from a more restrictive level of care to a lower level of care[.] * * * [B]ut the problem with it is that the people that were responsible for providing day-to-day, hour-to-hour supervision and care for Wesley didn't have a written plan that they could consult and use to make decisions about what they were going to do or not do with Wesley based on his behavior in the moment.

(Kukor Depo. at 102-103.) Dr. Kukor noted that the failure to create a revised IP for Barnett violated the Ohio Admin. Code 5123:2-1-11 (Service and Support Administration provisions).[4]

### C. Employees' Entitlement to Immunity

**{¶ 62}** Upon review of the evidence submitted by the parties, and viewing the evidence in the light most favorable to the Strayers, we find that there are no genuine issues of material fact and that, as a matter of law, the CCDD employees' conduct did not constitute a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct."

**{¶ 63}** Beginning with Garrett, Barnett's long-time Path Coordinator, the evidence reflects that, after Garrett was notified that Barnett would be leaving IDTC and returning to Ohio, she began to investigate new placements and schooling for Barnett. This involved numerous discussions with Barnett's parents (his guardians), potential housing providers, and potential schooling options. Garrett left her employment with CCDD on March 29, 2012, nearly two months before Barnett returned to Ohio from Indiana. Although Garrett did not complete a new IP or behavior support plan for Barnett before she left her employment with CCDD, her provision of service and support administration to Barnett in February and March of 2012 cannot reasonably be categorized as reckless or wanton conduct. The trial court properly granted summary judgment to Garrett

---

[4] Ohio Admin. Code 5123:2-1-11, addressing county boards of "mental retardation" and developmental disabilities, has been revised, effective March 17, 2014. Among other changes, the current version renumbered some of the provisions, and an individual plan is now known as an individual service plan (ISP).

pursuant to R.C. 2744.03(A)(6).

{¶ 64} Turning to Horvath, Garrett's successor as Barnett's Path Coordinator, the Strayers claim that Horvath's placement of Barnett in a residential setting without an updated IP and behavior support plan amounted to reckless or wanton conduct, and that Willis (Garrett's and Horvath's supervisor) also was not immune from liability due to his failure to ensure that Barnett's case was "properly managed and properly transitioned within the agency."

{¶ 65} There is no genuine issue of material fact that, prior to the June 21 incident, a revised IP was not prepared to specifically address Barnett's relocation from IDTC to a residential setting. Both Willis and Horvath testified that there was a "paperwork" error, and Horvath indicated that, after the incident, he was put on administrative leave by CCDD because "the paperwork was not completed."

{¶ 66} However, upon review of all of the evidence, we find no genuine issue of material fact that the absence of the revised paperwork did not amount to recklessness. Both Garrett and Horvath sent documentation about Barnett, including Barnett's most recent IP and behavior support plan for IDTC, to SRI prior to Barnett's residential placement. The March 2012 IP indicated that Barnett "has a history of MUI's involving physical intervention for physical aggression" and other inappropriate behaviors, such as inappropriate urination. With respect to alone time, it stated: "Wesley has no alone time. He must be within hearing distance at all times when in an enclosed area. When in an open area or around other people Wesley must be within vision at all times due to a tendency to elope or become aggressive." Wells testified that an IP for Barnett was available in the residence, and that she used it as a reference for Barnett's care. The

Daily Documentation form that SRI completed included the requirement that staff "monitor for inappropriate behaviors (physical aggression, inappropriate urination) and document as an Unusual Incident as they occur. Refer to IP." Other Daily Documentation requirements, such as waking Barnett three times throughout the night to urinate and the "alone time" monitoring, mirrored Barnett's prior IP.

**{¶ 67}** The February 2012 behavior support plan indicated that Barnett's physical aggression consisted of hitting, head butting, throwing objects at people, and biting, and it indicated potential triggers for those behaviors. In addition, during several "support team" meetings to prepare for Barnett's transition to residential care, SRI was informed of and discussed Barnett's aggressive behaviors and the potential triggers. In April 2012, Menier prepared a positive behavior plan for Barnett, and although it was never formalized as a behavior support plan, Menier met with Barnett's service providers and trained them on Barnett's behaviors of concern. SRI staff were not permitted, by law, to use chemical and physical restraints, as provided in the IDTC behavior support plan, but all SRI staff had been trained in positive supports (Do The Right Thing) by SRI. Although Horvath perhaps should have provided updated documentation (IP and behavior support plan) to SRI prior to Barnett's transition to residential care in Clark County, Horvath's actions did not, as a matter of law, display a conscious disregard of or indifference to a known risk of harm to others. Stated simply, Horvath's conduct was neither reckless nor wanton.

**{¶ 68}** We recognize that Dr. Kukor testified in his deposition that the absence of a written plan was reckless because SRI did not have updated documentation, specific to Barnett's residential placement, to consult and use to make decisions about Barnett

based on his behavior. Dr. Kukor indicated that an updated IP and behavior support plan should have accounted for changes in the amount of supervision that Barnett would have. Dr. Kukor indicated that, in the absence of updated documentation, he could not tell whether CCDD employees and SRI had a plan to manage Barnett's care and the risk of aggression. Willis testified that Barnett's IP would have mirrored the IP that had previously been in place at IDTC, and that the only change at the beginning of Barnett's residential placement would have been changing the name of the service provider from IDTC to SRI; the members of Barnett's support team anticipated that a plan would be "tweeked" based on how Barnett adapted to residential placement. Considering the entirety of the evidence presented, including CCDD's provision of and SRI's use of Barnett's prior IP and behavioral information regarding Barnett to inform Barnett's care, Dr. Kukor's testimony does not, by itself, create a genuine issue of material fact about the recklessness of Horvath's provision of service and support administration for Barnett.

{¶ 69} During the relevant time period, Willis was a Path Coordinator supervisor with CCDD. In that position, Willis supervised ten Path Coordinators, who served as the service and support administrators. Although no path coordinator prepared an updated IP and formalized a new behavior support plan for Barnett upon his transition to residential placement, we find nothing in the record to suggest that Willis's supervision of Barnett's Path Coordinators rose to the level of reckless or wanton conduct.

{¶ 70} The trial court properly granted summary judgment to Garrett, Horvath, and Willis pursuant to R.C. 2744.03(A)(6).

## V. Conclusion

{¶ 71} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, P.J. and WELBAUM, J., concur.

Copies mailed to:

Valerie Juergens Wilt
Mark Landes
Andrew N. Yosowitz
Robert Byrne
Karen Clouse
Wesley R. Barnett, c/o Carolyn Barnett or Michael Barnett, Guardians
Hon. Douglas M. Rastatter