[Cite as *Reynolds v. Hamilton Cty. Dev. Disabilities Servs.*, 2024-Ohio-83.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JAMES REYNOLDS, | : | APPEAL NO. C-230046<br>TRIAL NO. A-1905513 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| HAMILTON COUNTY<br>DEVELOPMENTAL DISABILITIES<br>SERVICES, | : | |
| | : | |
| ALICE PAVEY, Individually and in her<br>official capacity as Superintendent, | : | |
| | : | |
| SHAWN GARVER, Individually and in<br>his official capacity as Human<br>Resources Director, | : | |
| | : | |
| JENNIE R. FLOWERS, Individually<br>and in her official capacity as MUI<br>Director, | : | |
| | : | |
| HANS VAN RHEENAN, Individually<br>and in his official capacity as Service<br>and Supports Administrator, | : | |
| | : | |
| KELLEY TEKESTE, Individually and in<br>her official capacity as Behavior<br>Specialist, | : | |
| | : | |
| ERIC A. METZGER, Individually and<br>in his official capacity as Integration<br>and Advocacy, | : | |
| | : | |
| CHRIS MURPHY, Individually and in<br>his official capacity as MUI<br>Investigator, | : | |
| | : | |
| and | : | |
| | : | |
| DAWN FREUDENBERG, Individually<br>and in her official capacity as | : | |

Innovation and Quality,

        Defendants-Appellants.            :

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: January 12, 2024

*Gatlin Voelker, PLLC*, and *Anthony Bucher*, for Plainitff-Appellee,

*Schroeder, Maundrill, Barbiere & Powers*, *Scott A. Sollman* and *Kurt Irey*, for Defendants-Appellants.

**WINKLER, Judge.**

**{¶1}** Plaintiff-appellee James Reynolds filed a complaint alleging wrongful discharge, defamation, and violations of R.C. 4112.02 against defendants-appellants, Hamilton County Developmental Disabilities Services ("HCDDS"), Alice Pavey, Shawn Garver, Jennie R. Flowers, Hans Von Rheenan, Kelley Tekeste, Eric Metzger, Chris Murphy, and Dawn Freudenberg in both their individual and official capacities. Appellants filed a motion for summary judgment in which they asserted a defense of immunity under R.C. Chapter 2744 and 5123.61(K).

**{¶2}** The trial court denied the motion for summary judgment. It found that genuine issues of material fact existed regarding "whether Reynolds was a common law employee of HCDDS and/or whether HCDDS was a co-employer of Reynolds. All of Plaintiff's claims with the exception of the defamation claim, depend on the determination of the foregoing." As to the defamation claim, it stated that "this claim would survive this Motion regardless, as there are issues of material fact that must be determined at trial." The court also stated that "[t]here is no just reason for delay" under Civ.R. 54(B). This appeal followed.

### I. Factual Background

**{¶3}** This case involves agencies providing supported living and residential services to individuals with developmental disabilities. These services are known as Individual Options Waiver Services. The Individual Options Waiver ("IO waiver") is a Medicaid waiver for clients who have developmental disabilities and who are eligible to use that waiver to receive care and support in their homes and communities. The use of these waiver services to fund supported living services results in a complex relationship between the recipients, the providers, county boards of developmental

disabilities, the Ohio Department of Developmental Disabilities ("DODD"), and Ohio Department of Job and Family Services ("ODJFS").

{¶4} The DODD is the statewide governmental agency responsible for overseeing all of the services and IO waivers provided to clients. It writes the rules and handles the licensing of providers, which consist of numerous residential homes and day programs throughout the state. Waiver services vary depending on the client's needs, but could include services such as personal care, home modifications, transportation, social work, equipment, and home-delivered meals. Each IO waiver determines the number of services that will be provided to a client.

{¶5} DODD and HCDDS personnel, including county behavioral support specialists ("BSS") and county support service administrators ("SSA") use IO waivers to implement an individual service plan ("ISP") specific to each client. Individual clients can select certified providers of their choice. Providers are certified by DODD and the Ohio Department of Medicaid and are listed on the DODD website. The providers employ direct support personnel ("DSP"), who ensure that clients follow their ISP by tracking "outcomes," which are documented and billed by the provider. Medicaid and DODD submit weekly payments to the provider.

{¶6} Individuals who serve the county as BSSes, SSAs, or DSPs are "mandatory reporters," who have a statutory responsibility to report allegations of abuse, neglect, or other major unusual incidents ("MUIs"). *See* R.C. 5123.61(C). Once these issues are reported, HCDDS and its investigative agents must review the report, investigate the incident, and submit a report to DODD of their findings. If the incident involves an MUI, those findings include whether the MUI has been substantiated. But HCDDS does not have authority to take action concerning the person involved in the substantiated claim. Ohio law requires DODD to have a registry office for purposes of

maintaining, reviewing, investigating, and depending on the circumstances, acting on these reports, including placing someone on the abuser registry.

{¶7} A Ray of Hope was a certified waiver provider under contract with DODD. It was incorporated in 2013, and during the relevant times, Laura Switzer was its sole owner. It provided a residential program, as well as a separate day program called Perfect Circles. As a provider, it was required to employ at least one DSP. The residential and the day program each used the same people as employees.

{¶8} At A Ray of Hope, Reynolds worked as a DSP, and later, he also served as its Chief Financial Officer ("CFO"). After he began working at A Ray of Hope, he did not work for any other provider. He billed A Ray of Hope for his services and his paychecks came from A Ray of Hope. He stated that he did not work directly for HCDDS, he did not receive any payments for waiver services from HCDDS, and he was not required to sign any of HCDDS's policies. He also testified that A Ray of Hope had its own internal policies apart from DODD's rules and regulations, with which he had to comply.

{¶9} Reynolds negotiated with A Ray of Hope with respect to his position, potential ownership, and potential bonuses. When he started as a DSP with A Ray of Hope, he brought a "big client" with him, and he later became CFO. In that position, he "looked at the finances," "helped people get their paychecks," "helped make the schedule," and "put the staff in place where they were going to be working." He hired other DSPs and had authority to hire and fire employees at A Ray of Hope. Finally, he testified that only he and Switzer had financial control of A Ray of Hope, and they were responsible for paying staff.

{¶10} Because Perfect Circles was a day program, he was able to use Perfect Circles at night as his own entity to generate additional revenue through nonwaiver

activities, such as martial arts and a recording studio. He said he created the name Perfect Circles, and he owned "Perfect Circles Boxing and Recording." On his 2016 and 2017 tax returns, he filed as a self-employed person and independent contractor.

{¶11} Reynolds contended that around July 2016, HCDDS employees started comparing Reynolds, a black male, to Barry Isaacs, another black male service provider, who was accused and ultimately convicted of fraud related to his work as a DSP. Reynolds learned of those comparisons and complained that they were unjustified and racially motivated. Metzger, HCDDS Director of Integration and Advocacy, sent an email to various HCDDS employees asking if anyone had concerns about Reynolds or A Ray of Hope. In response, Mark Unterbrink, an Investigative Agent in the Major Unusual Incident Unit, referred to Reynolds as "the next Barry Issacs." Reynolds noted that he had "dreads and piercings," as did Isaacs.

{¶12} Reynolds further testified that he had a conversation with Van Rheenan, an SSA, and Tekeste, a BSS, in which they told him that Metzger had "problems with Issacs." Metzger had said that Isaacs was "ghetto" and a "thug." Tekeste had to go with Isaacs to county board meetings so that they didn't think Isaacs was a "thug" or "too ghetto to run a company."

{¶13} Subsequently, Metzger sent an email to various HCDDS employees acknowledging that Reynolds was upset about being compared to Isaacs and agreeing that the "thug" association with Reynolds was "unfair." Metzger acknowledged that he had once thought of Reynolds in that way. He then sent an email to Reynolds and Switzer agreeing that the comparisons to Isaacs were "untrue" and "unfair."

{¶14} On January 3, 2017, Metzger sent a "clean the slate" email to Reynolds and Switzer, which was copied to several HCDDS employees, in which he acknowledged that the relationship between Reynolds and HCDDS was tenuous. He

also confirmed that Reynolds was not an associate of Isaacs, and he should not be compared to Isaacs.

{¶15} Reynolds complained about discrimination at a meeting on January 18, 2017, which was led by Metzger. According to Reynolds, Metzger had shown up unannounced the following day at Perfect Circles. Then Metzger reported compliance issues to DDOD.

{¶16} On April 25, 2017, Van Rheenan and Tekeste visited a Perfect Circles daycare program, where they spoke with clients. One client informed them that he had called the police on April 20, 2017, because of a peer-to-peer incident in which he was verbally threatened by another client. They sent an email to Reynolds advising him about what they learned during the visit. Reynolds responded by stating that he had been in New York and did not know that the police had been called.

{¶17} Flowers was the Director of the MUI Department for HCDDS. On April 17, 2017, she received a report of verbal abuse involving Reynolds, accompanied by an audio recording capturing the alleged verbal abuse. Flowers testified that while she was investigating that report, she discovered other allegations involving Reynolds, including misappropriation of funds, abuse, and neglect. On May 1, 2017, she initiated two MUIs in which Reynolds was the primary person of interest. One stated that Reynolds had verbally abused two clients on April 25, 2017. The second stated that Reynolds had failed to report the April 20, 2017 peer-to-peer incident that was reported to Van Rheenan and Tekeste.

{¶18} As a result of the initial allegation of verbal abuse involving Reynolds and two clients from A Ray of Hope, Flowers recommended to Switzer that she remove Reynolds from having contact with those two clients. She testified that it was up to the owner's discretion whether to follow that recommendation. She also stated that

neither she, nor HCDDS, had authority to remove any clients from their programs. Further, Reynolds testified that no BSS or SSA from HCDDS had ever ordered a DSP from A Ray of Hope not to work with a specific client or had any input as to the hiring and firing of A Ray of Hope's employees.

{¶19} Reynolds first found out about the investigation into the verbal-abuse allegation on May 5, 2017. On that day, Switzer instructed him to have no contact with A Ray of Hope's clients until further notice. Nevertheless, under Switzer's direction, he continued to be regularly paid by A Ray of Hope.

{¶20} On June 21, 2017, A Ray of Hope was suspended by the Ohio Department of Medicaid due to credible allegations of fraud. Reynolds said that Medicaid later closed its investigation because it had "no prosecutorial merit." He added that A Ray of Hope was shut down by the Attorney General for "safety concerns." Reynolds thought that he was also suspended, but he later realized that he was not under any suspension. Since June 21, 2021, he has been employed with another provider as a community access specialist and a community living support specialist, providing services like the ones he had been performing for A Ray of Hope.

## I.     *Political-Subdivision Immunity*

{¶21} In their first assignment of error, appellants contend that the trial court erred by failing to grant their motion for summary judgment on all claims. They argue that HCDDS and the individual appellants are entitled to immunity under R.C. 2744.03(A)(3) and 5123.61(K) on all claims. They also argue that HCDDS and the individual appellants acting in their official capacity are immune from an award of punitive damages or attorney fees. We find merit in appellants' argument.

### A. Standard of Review

**{¶22}** An appellate court reviews a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Maas v. Maas*, 2020-Ohio-5160, 161 N.E.3d 863, ¶ 13 (1st Dist.). Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Maas* at ¶ 13.

### B. Employee v. Independent Contractor

**{¶23}** R.C. Chapter 2744, the Political Subdivision Liability Act, establishes a comprehensive statutory scheme for the tort liability of political subdivisions and their employees. *Piazza v. Cuyahoga Cty.*, 157 Ohio St.3d 497, 2019-Ohio-2499, 138 N.E.3d 1108, ¶ 11. R.C. 2744.09 "identifies certain scenarios in which R.C. Chapter 2744.09 does not apply." *Id.* at ¶ 11. R.C. 2744.09(B) provides, "This chapter does not apply to, and shall not be construed to apply to * * * [c]ivil actions by an employee * * * against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision * * *." This section removes immunity only as to the political subdivision and does not affect the statutory immunity of a fellow employee. *Zumwalde v. Madeira & Indian Hill Joint Fire Dist.*, 128 Ohio St.3d 492, 2011-Ohio-1603, 946 N.E.2d 748, syllabus.

**{¶24}** We begin our analysis by addressing the issue of whether Reynolds was an employee or an independent contractor. Reynolds acknowledges that he was not a

direct employee of HCDDS. He claims that he was an employee under an agency or joint-enterprise theory. His argument ignores the definition of employee set forth in R.C. 2744.01(B). It states that "Employee" means "an officer, agent, employee, or servant, whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision." It further states, that "Employee" does not include an independent contractor * * *."

{¶25} The term "independent contractor" is not defined in R.C. Chapter 2744, so we look to common law regarding both employment and agency relationships for the test to distinguish an employee from an independent contractor. *Trucco Constr. Co. v. Fremont*, 6th Dist. Sandusky No. S-12-007, 2013-Ohio-415, ¶ 18. Generally, a party is classified as an independent contractor, rather than an employee or agent, based upon the ability of the political subdivision to control the work to be performed. *Lakota v. Ashtabula*, 11th Dist. Ashtabula No. 2015-A-0010, 2015-Ohio-3413, ¶ 37; *Trucco Constr. Co.* at ¶ 22; *Wade-Hairston v. Franklin Cty. Bd. of Mental Retardation & Dev. Disabilities*, 10th Dist. Franklin No. 98-AP-456, 1998 Ohio App. LEXIS 6223, 10-11 (Dec. 17, 1998). "When a party agrees to produce some end product or result without the political subdivision having any right to control the method of accomplishing the specific work/services to be performed, the party is deemed to be an independent contractor." *Trucco Constr. Co.* at ¶ 22.

{¶26} The determination of whether a party is an employee or an independent contractor is fact specific. If the evidence is not in conflict, or if the facts are admitted, the question of whether a person is an employee or independent contractor is an issue of law. But if the facts are disputed, it is an issue of fact for a trier of fact to decide.

*Trucco Constr. Co.* at ¶ 23, and *Wade-Hairston* at 11, both citing *Bostic v. Connor*, 37 Ohio St.3d 144, 524 N.E.2d 881 (1988).

{**¶27**} The facts in this case as to Reynold's employment status are not in dispute. Reynolds worked as a DSP at A Ray of Hope, and later, he also served as its CFO. He billed A Ray of Hope for his services. He testified that his paychecks came from A Ray of Hope. He stated that he did not work directly for HCDDS, he did not receive any payments for waiver services from HCDDS, and he was not required to sign any of HCDDS's policies. He also testified that A Ray of Hope had its own internal policies apart from DODD's rules and regulations, with which he had to comply.

{**¶28**} DODD and HCDDS have some control over the service providers in that they promulgate rules and regulations consistent with the statutes governing IO waivers. But that doesn't mean that any individual who works for a certified service provider qualifies as an employee. If we accept Reynolds's argument that he was an employee, then arguably any person or entity subject to rules or regulations could be an employee of that entity.

{**¶29**} A Ray of Hope was a separate entity and HCDDS could not control all its activities. Flowers testified that she could only recommend that Switzer suspend him from having contact with A Ray of Hope's clients. She testified that it was up to the owner's discretion whether to follow that recommendation. She also stated that neither she, nor HCDDS, had authority to remove any clients from their programs. Further, Reynolds testified that no BSS or SSA from HCDDS, had ever ordered a DSP from A Ray of Hope not to work with a specific client, nor did they have any input as to the hiring and firing of A Ray of Hope's employees. Additionally, Reynolds testified that despite the pending investigation against him and the fact that he could not provide any waiver services, Switzer, in her discretion, decided to keep paying him.

**{¶30}** Reynolds relies on various administrative regulations in arguing that he was acting as an employee of HCDDS. We do not agree that those regulations change the conclusion that Reynolds was not an employee of HCDDS.

**{¶31}** This case is similar to *Wade-Hairston*, 10th Dist. Franklin No. 98AP-456, 1998 Ohio App. LEXIS 6223, in which the plaintiffs were originally full-time employees of the Franklin County Board of Mental Retardation and Developmental Disabilities ("Board"). They worked at a sheltered workshop for intellectually disabled individuals. They were asked if they wanted to provide IO waiver services in their homes. They were told that they would be providing those services through the state Department of Mental Retardation and Developmental Disabilities. After training and entering into separate provider agreements, they provided waiver services in their home or the homes of their consumers.

**{¶32}** Plaintiffs filed suit for wages and overtime pay under the federal Fair Labor Standards Act and R.C. 4111.03. Because the trial court found that the plaintiffs were independent contractors and not employees of the Board while they were providing waiver services, it granted the Board's motion for summary judgment.

**{¶33}** In determining whether the plaintiffs were employees or independent contractors, the appellate court stated, "If the employer reserves the right to control the manner or means of doing the work, the relation created is that of master and servant, while if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created." *Id.* at 10-11, quoting *Bostic,* 37 Ohio St.3d at 146, 524 N.E.2d 881. The determination of who has the right to control must be made by examining the individual facts of each case including: (1) who controls the details and the quality of the work; (2) who controls the hours that are worked; and (3) who selects the

materials, tools, and the personnel used in performing the work. *Id.* at 11, citing *Bostic* at 146.

**{¶34}** The court stated that the plaintiffs never received any payments for waiver services from the Board. They each entered into a provider contract with the Board, which stated that they were individually responsible for all expenses incurred, that they had to carry liability insurance, and that they were responsible for fulfilling the requirements and goals for each consumer. The court also noted that during the time in question, the plaintiffs filed tax forms that would be applicable only to self-employed individuals. It concluded that "there was little or no control exercised over the manner and means by which [plaintiffs] provided waiver services," and that plaintiffs were independent contractors. *Wade-Hairston,* 10th Dist. Franklin No. 98AP-456, 1998 Ohio App. LEXIS 6223, at 12.

**{¶35}** Finally, the court noted that plaintiffs had argued that "because the Board oversaw the program, i.e., developed the goals and requirements for each consumer and supervised the waiver program, that an employee/employer relationship was established." *Id.* The court disagreed. It stated, "[t]he provider contract is primary evidence of the parties' contractual relationship. [Plaintiffs] were permitted to use their discretion in meeting the goals and objectives set forth for each consumer. The goals and objectives set forth by the Board were merely the guidelines to be used by [plaintiffs] in successfully completing the requirements of the waiver program." *Id.* at 12-13.

**{¶36}** Similarly, in *Williams v. Richland Cty. Children Servs.*, 861 F.Supp.2d 874 (N.D.Ohio 2011), the plaintiff was owner of a company that provided housing and transportation for the elderly and special-needs individuals. She filed a complaint

against the defendants, a children services agency and various employees of the agency. The defendants filed a motion to dismiss.

**{¶37}** The court granted the motion to dismiss as to the agency because plaintiff was not an employee of the agency. The court stated,

> Courts distinguish employee and independent contractor status by determining whether the employer has the right to control the manner in which the work is performed. The following elements are considered in determining the independent contractor/employee question: the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation. No one factor is dispositive.

*Williams* at 884, citing *Simpson v. Ernst & Young*, 100 F.3d 436, 443 (6th Cir.1996).

**{¶38}** The court determined that the plaintiff was an independent contractor. It reasoned that that the agency did not retain any control over how she carried out transportation assignments or the route she took; the agency did not provide plaintiff with a car or any other vehicle to conduct her transportation duties; her business provided numerous services other than transportation; she did business with several different agencies; and she was not paid by the agency but from various other sources, including Medicaid and Medicare.

{¶39} The court rejected the plaintiff's argument that she was an employee because the agency had significant control over her duties since it dictated whom she transported, the amount charged, the nature of the trips assigned, and whether the work was part of the agency's regular business. It stated that "case law is clear that a workers lack of discretion is not an indication of employee status, particularly when the lack of discretion is the result of governmental regulation." *Williams*, 861 F.Supp.2d at 884.

{¶40} Reynolds's testimony showed that he negotiated with A Ray of Hope, not HCDDS, with respect to his position, potential ownership, and potential bonuses. HCDDS did not own or control the building used by A Ray of Hope. He stated that A Ray of Hope rented the building from a third party. No BSSes or SSAs had their offices in that building. Reynolds was able to use the building and the name Perfect Circles to generate additional revenue through nonwaiver services activities. HCDDS did not provide him with a vehicle to conduct his duties. He used his own vehicle or a vehicle rented by A Ray of Hope.

{¶41} Reynolds had no contract with HCDDS, and he testified that he never had to sign off on any HCDDS policies, but instead only had to comply with rules and regulations that were issued by the state. A Ray of Hope had its own internal policies. As CFO, he made the schedule, issued payroll, had financial control, and had the authority to hire, fire, and discipline its employees. He further stated that HCDDS had no control over who or how he scheduled employees to carry out A Ray of Hope's duties. He testified that he paid himself as an independent contractor, and his tax returns reflected that status.

{¶42} We hold as a matter of law that Reynolds was an independent contractor, not an employee of HCDDS. Therefore, the exception from immunity for

15

employees of political subdivisions does not apply. The trial court erred in denying appellants' motion for summary judgment on the basis that issues of fact existed as to whether Reynolds was an employee of HCDDS.

### C. Appellate Review of Immunity Claims

{¶43} Next, we address the issue of whether HCDDS is entitled to immunity and whether any other exceptions to that immunity apply. Generally, we would remand unresolved issues to the trial court to determine them in the first instance. But R.C. 2744.02(C) provides that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of law is a final order." The Ohio Supreme Court has held that when a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, "that order denies the benefit of an alleged immunity and, therefore is a final, appealable order pursuant to R.C. 2744.02(C)." *Hubble v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, syllabus.

{¶44} The court in *Hubble* also noted policy reasons for its "broad interpretation of R.C. 2744.02(B)." *Slonsky v. J.W. Didado Elec., Inc.*, 9th Dist. Summit No. 24228, 2008-Ohio-6791, ¶ 7. "As the General Assembly envisioned, the determination of immunity could be made prior to investing the time, effort and expense of the courts, attorneys, parties and witnesses * * *." *Id.* at ¶ 7, quoting *Hubble* at ¶ 26.

{¶45} After a de novo review of the law and facts, if genuine issues of fact remain, a court of appeals may remand the cause to the trial court for further development of the facts necessary to resolve the immunity issue. But if only issues of

law remain, we may decide the appeal based on those issues of law. *See Slonsky* at ¶ 8.

### D. A Three-Tiered Analysis

**{¶46}** Determining whether a political subdivision is immune from tort liability under R.C. Chapter 2744 involves a three-tiered analysis. *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 15; *Inwood Village, Ltd. v. Cincinnati*, 1st Dist. Hamilton No. C-110117, 2011-Ohio-6632, ¶ 11. The first tier provides a general grant of immunity. A political subdivision is immune from liability incurred performing either a governmental or a proprietary function. R.C. 2744.02(A); *Pelletier* at ¶ 15; *Inwood Village* at ¶ 11.

**{¶47}** The second tier requires a court to determine whether any of the five exceptions set forth in R.C. 2744.02(B) apply. *Pelletier* at ¶ 15; *Inwood Village* at ¶ 11. Under the third tier, if any of those exceptions apply, a court must determine whether any of the defenses contained in R.C. 2744.03 apply to reinstate immunity. *Pelletier* at ¶ 15; *Inwood Village.* at ¶ 11.

**{¶48}** It is undisputed that HCDDS is a political subdivision. Similarly, Reynolds does not argue that it was not performing a governmental function. R.C. 2744.01(C)(2)(o) specifically provides that the "operation of mental health facilities, developmental disabilities facilities, alcohol treatment and control centers, and children's homes or agencies" are governmental functions. Therefore, HCDDS is entitled to the general grant of immunity under the first tier of the analysis.

**{¶49}** Under the second tier, we must determine whether any of the exceptions to the general grant of immunity in R.C. 2744.02(B) apply. In light of the presumption of broad immunity for political subdivisions, the statute does not place the burden on

the political subdivision to demonstrate that no exceptions apply. "[R]ather, once the first tier has been met, the plaintiff must demonstrate one of the statutorily defined exceptions apply in order to proceed." *Fried v. Friends of Breakthrough Schools.*, 8th Dist. Cuyahoga No. 108766, 2020-Ohio-4215, ¶ 22.

{¶50} Appellants raised the issue of immunity in their motion for summary judgment. Reynolds did not address that issue in his memorandum in response, but instead argued the merits of the claims in his complaint. In his brief to this court, he has not specified which exceptions to immunity in R.C. 2744.02(B) apply, and we find none.

{¶51} Instead, Reynolds relies on R.C. 2744.03(A)(5), which states that a political subdivision is immune from liability if the "injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the discretion was exercised with malicious purpose, bad faith, or in a wanton or reckless manner." But the application of R.C. 2744.03 is the third tier of the analysis. If none of the exceptions in R.C. 2744.02(B) apply, the political subdivision is immune from liability and the analysis ends. *Partin v. Norwood*, 1st Dist. Hamilton No. C-140461, 2015-Ohio-1616, ¶ 18. Therefore, we need not reach issue of whether R.C. 2744.03 applies.

{¶52} Thus, HCDDS and employees acting in their official capacity are entitled to immunity as a matter of law on Reynolds's claims for wrongful discharge, harassment, alteration of conditions of employment, and retaliation. Therefore, the trial court erred in denying appellants' motion for summary judgment as to those claims.

**{¶53}** As to Reynolds's defamation claim, the trial court stated that that claim was not dependent on the determination of whether Reynolds was an employee of HCDDS. It further stated that the defamation claim would survive the motion for summary judgment "as there are issues of material fact that must be determined at trial."

**{¶54}** In Ohio, the tort of defamation may be either negligent or intentional. *Mayer v. Bodnar*, 5th Dist. Delaware No. 22 CAE 05 0041, 2022-Ohio-4705, ¶ 51; *Price v. Austintown Local School Dist. Bd. of Edn.*, 178 Ohio App.3d 256, 2008-Ohio-4514, 897 N.E.2d 700, ¶ 25 (7th Dist.). But Reynolds has only alleged intentional conduct, and political subdivisions are immune from intentional torts. *Yankovitz v. Greater Cleveland Regional Transit Auth.*, 8th Dist. Cuyahoga No. 112040, 2023-Ohio-2584, ¶ 39; *Fried*, 8th Dist. Cuyahoga No. 108766, 2020-Ohio-4215, at ¶ 24; *Price* at ¶ 22.

**{¶55}** HCDDS and the appellants acting in their official capacity also argue that they are immune from an award of punitive damages or attorney fees. We agree. R.C. 2744.05(A) states that "punitive or exemplary damages shall not be awarded" against a political subdivision. Further, attorney fees may not be awarded against a political subdivision unless specifically authorized by statute. *Speller v. Toledo Pub. School Dist. Bd. of Edn.*, 2015-Ohio-2672, 38 N.E.3d 509, ¶ 52 (6th Dist.).

**{¶56}** Those appellants also argue that they are entitled to immunity under R.C. 5123.61(K), which involves their duty to report abuse, neglect, and other major unusual incidents to a law enforcement agency or to a county board of developmental disabilities. Since we have already determined that the appellants are immune under R.C. Chapter 2744, this issue is moot and we decline to address it.

{¶57} In sum, we hold as a matter of law that HCDDS and the other appellants acting in their official capacity have immunity with regard to all of Reynolds's claims, and the trial court erred in failing to grant their motion for summary judgment on all of Reynolds's claims. Consequently, we sustain appellants' first assignment of error.

## II. Political-Subdivision-Employee Immunity

{¶58} In their second assignment of error, appellants contend that the trial court erred in failing to address the immunity of the appellants in their individual capacities ("employees-appellants") and in failing to grant summary judgment in their favor. They argue that they are entitled to immunity under both R.C. Chapter 2744 and 5123.61(K) on all claims. This assignment of error is well taken.

{¶59} R.C. 2744.03(A)(6) provides that employees of a political subdivision enjoy a presumption of immunity in connection with their performance of governmental or proprietary functions unless any of three exceptions apply. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 21; *Morelia Group-De, LLC v. Weidman*, 1st Dist. Hamilton No. C-220153, 2023-Ohio-386, ¶ 24. Those exceptions are (1) the employees acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (2) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; (3) civil liability is expressly imposed upon the employee by a section of the Revised Code. R.C. 2744.03(A)(6)(a)-(c); *Morelia Group-De* at ¶ 25. The exceptions to immunity must be narrowly construed. *Stoll v. Gardner*, 182 Ohio App.3d 214, 2009-Ohio-1865, 912 N.E.2d 165, ¶ 16 (9th Dist.).

{¶60} For purposes of R.C. 2744.03, "malice" has been defined as the "willful and intentional desire to harm another, usually seriously, through conduct which is

unlawful or unjustified." *Morelia Group-De* at ¶ 29. When an employee's conduct is motivated by actual malice, it is outside the scope of his or her employment. *Id.* at ¶ 27. Bad faith means more than bad judgment or negligence. It implies "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking in the nature of fraud." *Alagha v. Cameron*, 1st Dist. Hamilton No. C-081208, 2009-Ohio-4886, ¶ 20, quoting *Wooten v. Vogele*, 147 Ohio App.3d 216, 2001-Ohio-7096, 769 N.E.2d 889, ¶ 19 (1st Dist.).

{¶61} Willful and wanton misconduct is something more than negligence. *Whitley v. Progressive Preferred Ins. Co.*, 2009-Ohio-6933, 970 N.E.2d 1009, ¶ 12 (1st Dist.). Wanton misconduct is the failure to exercise any care whatsoever toward those to whom a duty is owed if the failure to exercise care occurs when a great probability of harm exists. *Id.* at ¶ 12. Willful misconduct involves an "intent, purpose or design not to perform the duty of care that is owed." *Id.* at ¶ 12, quoting *Alagha* at ¶ 21. Recklessness is a perverse disregard of a known risk. The actor must be conscious that his or her conduct will probably result in injury. *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus; *Alagha* at ¶ 21.

{¶62} These are "rigorous standards" to establish. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 8; *Strayer v. Barnett*, 2d Dist. Clark No. 2016-CA-19, 2017-Ohio-5617, ¶ 39. Generally, the determination of whether an employee of a political subdivision acted willfully and wantonly is a question of fact for the jury. But where the record does not contain evidence of willful and wanton misconduct, a trial court may grant summary judgment in favor of the employee. *Whitley* at ¶ 13; *Alagha* at ¶ 22.

21

{¶63} Reynolds argues that the allegations against him surfaced shortly after he complained that the comparisons between him and Isaacs were unjustified and were racially motivated. He specifically cites Flowers's conduct during the MUI investigation. He contends that: (1) she initiated her investigation after his claim of racial discrimination; (2) she continued her investigation of the alleged verbal abuse after informal interviews with clients that denied any verbal abuse; (3) she continued her investigation after learning that Reynolds was out of town at the time of the alleged verbal abuse; (4) she initiated other MUI investigations based solely on unreliable claims of a severely developmentally disabled client; (5) she informed the Ohio Attorney General's Office that A Ray of Hope clients were "at risk trafficking victims"; (6) she implied that he was giving his clients drugs; (7) she falsely informed DODD that Reynolds was providing services in Clermont County after he had been removed from client contact; and (8) she allowed the investigation to linger for two years even though those investigations are supposed to be completed in 30 days.

{¶64} These arguments are largely based on mischaracterizations of the evidence. Flowers testified that she was unaware of any discrimination complaint before or during the MUI investigation. Further, undisputed evidence showed that the investigation was only initiated after a tip accompanied by an audio recording was received from a third-party informant. The record also shows that an employee of DODD, not Flowers or HCDDS, stated to the Attorney General's Office that A Ray of Hope clients were "at risk trafficking victims." The document, which Reynolds claimed implied that he was giving drugs to the client, did not mention drugs. It said only that Reynolds made "vape juice." Finally, the only document he refers to in support of the allegation that Flowers falsely stated to DODD that he was providing

serves in Clermont County was his amended complaint. The evidence did not support that allegation.

{¶65} Finally, as to the length of the investigation, Flowers testified that the state of Ohio dictates when an MUI investigation report becomes final. While an investigator can recommend a report for closure, the state issues that final closure. A standard investigation can take about 45 days, but the length of an investigation is determined on a case-by-case basis. Because extensions are available, some cases can take two years to close.

{¶66} Reynolds also claims that Flowers prohibited him from having any contact with clients, but the evidence showed that neither she nor HCDDS had the authority to prohibit Reynolds from having contact with A Ray of Hope clients. Although Flowers had recommended that Reynolds should not have contact with certain clients, the decision was ultimately up to Switzer, the owner of A Ray of Hope.

{¶67} Reynolds asserts that Flowers's MUI investigation resulted in the closure of A Ray of Hope, but the evidence showed that The Ohio Department of Medicaid suspended A Ray of Hope due to "credible allegations of fraud." Flowers testified that A Ray of Hope and Perfect Circles were being investigated for billing concerns prior to the initial verbal-abuse allegation that spurred Flowers's investigation.

{¶68} While some of the statements made by various employees-appellants were inappropriate, the evidence does not show that the employees-appellants' actions were manifestly outside the scope of their employment; that they engaged in willful or wanton misconduct; or that they acted recklessly or with actual malice. Reynolds has not met the "rigorous standard" to establish that the exceptions in R.C. 2744.03(6) apply. Consequently, the employees-appellants are entitled to immunity under R.C.

Chapter 2744, and we do not address whether they have immunity under R.C. 5123.61(K).  We overrule Reynolds's second assignment of error, reverse the trial court's judgment, and remand the cause to the trial court to enter summary judgment in favor of appellants.

Judgment reversed and cause remanded.

**CROUSE, P.J.,** and **BOCK, J.,** concur.

Please note:
The court has recorded its own entry this date.